UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ANTONIO KING,

Plaintiff,

v.

ACCELL SCHOOLS, LLC.,

Defendant.

Case No. 23-13308
Honorable Shalina D. Kumar
Magistrate Judge David R. Grand

---

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (ECF NO. 35) AND MOOTING DEFENDANT'S MOTION TO STRIKE (ECF NO. 40)**

---

## I.  Introduction

Plaintiff Antonio King ("King") sued defendant ACCELL Schools, LLC ("ACCELL") for wrongful termination in violation of public policy and Michigan's Whistleblowers' Protection Act ("WPA"), M.C.L. 15.362, and retaliation under Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), M.C.L. 37.2291 *et seq*. ECF No.6. ACCELL filed a motion for summary judgment on all claims and a motion to strike. ECF Nos. 35, 40. The motions are fully briefed, and the Court held oral argument on August 19, 2025. ECF Nos. 35, 38, 39; ECF Nos. 40, 41, 42. For the following reasons, the Court grants ACCELL's motion for summary judgment and terminates its motion to strike as moot.

## II.     Procedural and Factual Background

Antonio King worked for Barber Preparatory School ("Barber Prep")

for twelve years. King began his employment as the school's custodian and

worked his way up to become its Dean of Students. ECF No. 35-9,

PageID.482. In July 2021, ACCELL purchased Barber Prep and King

assumed a Family and Community Liaison position. *Id.* After this transition,

King reported to Barber Prep's principal, Nicole Arnold ("Arnold"), who

reported to Pamela Farris ("Farris"), the Regional Vice President of

ACCELL. ECF No. 35-11.

This lawsuit arises from King's handling of a weapon-related incident.

ACCELL has an Emergency Operations Plan ("EOP") that provides

guidance to Barber Prep employees on how to address safety-related

incidents. ECF No. 35-4, PageID.248.  The EOP provides Arnold with the

authority to activate the plan to provide an effective response to an

emergency or safety-related incident. *Id.* at PageID.251. The EOP states

that "[u]ntil non-school emergency responders arrive on-scene, the

Principal is responsible for activating the School EOP, including common

and/or specialized procedures, as well as hazard-specific incident plans."

*Id.* at PageID.252. The EOP does not explicitly address finding weapons at

the school in a non-active shooter context nor does it contain an annex for

the "weapon on campus" hazard. *Id.* at PageID.310, 395. However, the

EOP's Rapid Assessment Annex provides that if "information is received

that indicates a threat, potential threat, or other hazard the senior school

administration along with other necessary persons or resources will make

an assessment of the information and determine the proper actions to be

taken." *Id.* at PageID.389.

King testified that the school senior administration and leadership

were responsible for overseeing any safety issue and providing guidance

on policies relating to any safety issues that happened on school property.

ECF 35-9, PageID.485-86. ACCELL's Handbook (the "Handbook") also

provides that "[p]ossessing firearms, weapons, or explosives on Company

or school property without authorization . . . ." is considered unacceptable

behavior subject to termination of employment. ECF No. 35-8, PageID.469.

It further states that employees are responsible for identifying violators of

the weapons policy and that if an employee "either witness[es] or

suspect[s] another individual of violating this policy, [they] should

immediately report this information to their onsite supervisor." *Id.* at

PageID.476. King was aware that the Handbook contained a zero-

tolerance policy for possessing firearms and weapons on company

property or while conducting school business, and that violating that policy

could result in termination of employment. ECF No. 35-9, PageID.484.

ACCELL provided its employees with annual EOP training, which King was

required to attend.

On October 6, 2023, King found a suspected gun in a backpack at

Barber Prep. At approximately 9:00 a.m., King entered an empty classroom

where he saw a gun hanging out of a student's backpack. ECF No. 35-9,

PageID.487. King believed that this was a real gun. *Id.* at PageID.488. He

then grabbed the gun, wrapped it up in a yellow shirt, and walked out of the

room towards the front office around 9:12 a.m.



ECF No. 35-5, PageID.449. Farris was in the office at the time King

entered. The parties do not dispute that King walked past Farris without

notifying her that he found, and was carrying, a gun that he obtained in the

classroom. ECF No. 35-9, PageID.498; ECF No. 35-11, PageID.575.



ECF No. 35-5, PageID.450. Once in the office, King tapped on the shoulder of the school's assistant secretary, Tonya Brown ("Brown"), and asked to speak with her. *Id.* at PageID.452; ECF No. 35-9, PageID.487. King and Brown walked to the gym together, where King informed Brown that he found a gun and that he was taking it to the police department. ECF No. 35-9, PageID.487.



Page **5** of **27**

ECF No. 35-5, PageID.440. About four minutes later, King and Brown returned to the front office. *Id.* at PageID.441. King then walked to the IT classroom and left the gun in the empty room for approximately five minutes in a moment of panic. ECF No. 35-9, PageID.498-99.



ECF No. 35-5, PageID.456. He retrieved the gun from the room five minutes later and exited the building. While King was outside, he encountered Barber Prep's IT tech, Steve Williams ("Williams").



ECF No. 35-5, PageID.446. During their twenty-minute discussion, King told Williams that he found a gun and that he did not know what to do. ECF No. 35-9, PageID.488-89. At this point, the t-shirt wrapped gun is no longer in King's possession. King testified to putting the gun under the backseat of his vehicle. *Id.* at PageID.489. After the conversation with Williams, King reentered the school and walked past the security guard.



ECF No 35-5, PageID.445. King then left the school to drive to the Highland Park Police Department. He spoke to his wife for about a half hour before entering the police station. ECF No. 35-9, PageID.489. At about 10:30 a.m., King entered the Highland Park Police Department with

the gun wrapped in the shirt and spoke with Officer Everett Monroe

("Monroe"). ECF No. 35-7. Monroe took possession of the gun and

discovered that it was an unloaded air soft pistol. ECF No. 35-10,

PageID.551. When Monroe asked King why it took him so long to come to

the police station, he responded that he was trying to figure out if he should

take the gun to the police. ECF No. 35-9, PageID.490. King testified to

informing Monroe he did not tell administration that he discovered the gun

and he brought the gun to the people that "would actually do something

about it"—meaning that this was not the first time a weapon was found on

school property, and he brought it to the "people that would handle the

situation the right way." *Id.* at PageID.490. King requested to speak with

Monroe privately and relayed his belief that if he would have taken the gun

to the school's administration team (Farris or Arnold), "it would have been

swept under the rug and nothing would have happened." *Id.* at PageID.496.

He also told Monroe he thought the gun belonged to one of the seventh or

eighth grade boy students, and that he attended a training recently where

he was instructed to bring any discovered weapons immediately to the

police. *Id.* at PageID.493. Monroe told King that he should notify

administration and that the gun should not have been removed from the

area where he found it. ECF No. 35-10, PageID.555, 557. King testified

that he reported to the police department only that he found a gun, that he was bringing it to the police because he wanted action to be taken, and that he believed that the current administration would sweep the issue under the rug. ECF No. 35-9, PageID.503.

King left the Highland Park Police Department and went back to Barber Prep, at which point he informed Arnold that he found a gun in the school, and he took it to the police station. *Id.* at PageID.497.  Around 11:00 a.m., King sent Farris and Arnold a picture of the gun and Farris called the Highland Police Department to report that a weapon had been found on school property. ECF No. 35-11, PageID.575; ECF No. 35-9, PageID.497. Farris called King and asked him why he moved the gun and where he found it. ECF No. 35-9, PageID.497. Members of the Highland Park Police Department, including Monroe, arrived at Barber Prep and spoke to Farris, Arnold, and King. ECF No. 35-7; ECF No. 35-10, PageID.551. Thereafter, Arnold and Farris reviewed video footage to determine the source of the gun and how it entered the school. ECF No. 35-12. Although the video did not reveal anyone entering the empty room with the gun, it showed King walking around the school with the weapon concealed in a t-shirt for about forty minutes. *Id.* at PageID.596. As a result,

King was placed on paid administrative leave the day of the incident. ECF No. 38-1, PageID.652.

ACCELL terminated King's employment on October 14, 2023, for violating "Homeland Security Lockdown Procedures and Protocols" and for failing to alert his immediate supervisor and administration of the incident pursuant to policy and procedures, which "[p]ut himself in danger as well as the entire school community . . . ." *Id.*

On January 8, 2024, King filed suit against ACCELL alleging wrongful termination in violation of public policy and Michigan's WPA, and retaliation in violation of ELCRA. ECF No. 6. King claims that ACCELL unlawfully terminated his employment because he reported his suspicions that ACCELL violated the law by failing to report weapon-related incidents to the Highland Park Police Department. ACCELL moves for summary judgment on all of King's claims. ECF No. 35. ACCELL argues that King: (1) did not engage in protected activity under WPA, ELCRA, or his public policy tort claim; (2) cannot establish a causal connection between his termination and reporting the discovered gun to the Highland Park Police Department; (3) was terminated because his conduct that day was dangerous and in violation of the school's policies and procedures, rather than for making a police report. ACCELL also moves to strike the affidavit

of Dorthea Parker that King submitted with his response to ACCELL's

motion for summary judgment. ECF No. 40; ECF No. 38-1, PageID.660-62.

### III.    Standard of Review

If a party moves for summary judgment, it will be granted "if the

movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"A party asserting that a fact cannot be or is genuinely disputed must

support the assertion by: (A) citing to particular parts of materials in the

record . . . ; or (B) showing that the materials cited do not establish the

absence or presence of a genuine dispute, or that an adverse party cannot

produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

The standard for determining whether summary judgment is

appropriate is "whether the evidence presents a sufficient disagreement to

require submission to a jury or whether it is so one-sided that one party

must prevail as a matter of law." *State Farm Fire & Cas. Co. v. McGowan*,

421 F.3d 433, 436 (6th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*,

477 U.S. 242, 251-52 (1986)). Furthermore, the evidence and all

reasonable inferences must be construed in the light most favorable to the

non-moving party. *Matsushita Elec. Indus. Co.*, *Ltd. v. Zenith Radio Corp.*,

475 U.S. 574, 587 (1986).

Where the movant establishes a lack of a genuine issue of material fact, the burden of demonstrating the existence of such an issue shifts to the non-moving party to come forward with "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). That is, the party opposing a motion for summary judgment must make an affirmative showing with proper evidence and must "designate specific facts in affidavits, depositions, or other factual material showing 'evidence on which the jury could reasonably find for the plaintiff.'" *Brown v. Scott*, 329 F. Supp. 2d 905, 910 (E.D. Mich. 2004) (quoting *Anderson*, 477 U.S. at 252). To fulfill this burden, the non-moving party need only demonstrate the minimal standard that a jury could ostensibly find in his favor. *Anderson*, 477 U.S. at 248; *McLean v. 988011 Ontario*, *Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not satisfy this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 251.

The court's role is limited to determining whether there is a genuine dispute about a material fact, that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Such a determination requires that the court

"view the evidence presented through the prism of the substantive evidentiary burden" applicable to the case. *Id*. at 254. Hence, if plaintiffs must ultimately prove their case at trial by a preponderance of the evidence, then on a motion for summary judgment, the court must determine whether a jury could reasonably find that the plaintiffs' factual contentions are true by a preponderance of the evidence. *See id.* at 252-53. Finally, if the nonmoving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the movant is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

The court must construe Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury," but also for the rights of those "opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id*. at 327.

## IV.   Analysis

### a. Michigan Whistleblowers' Protection Act Claim

King initially alleged that ACCELL violated Michigan's WPA by firing him for reporting a violation of M.C.L. 750.237a(4), (6)(b)-(e), a statute

generally prohibiting gun possession in school zones, to the Highland Park Police. ECF No. 6, PageID.39. However, King now claims he was fired for reporting the administration for "suspected past, current, and future violations of the law" which includes its "fail[ure] to report violations involving weapons in the school, a claim that implicated the administration's failure to comply with mandatory reporting requirements." ECF No. 38, PageID.608, 618.

To establish a prima facie case under the WPA, King must show that: (1) he engaged in protected activity as defined by the act, (2) the defendant discharged him,[1] and (3) a causal connection exists between the protected activity and the discharge. *Smith v. Gentiva Health Servs. (USA) Inc.*, 296 F. Supp. 2d 758, 762 (E.D. Mich. 2003) (citing *Chandler v. Dowell Schlumberger Inc.*, 572 N.W.2d 210, 212 (Mich. 1998)). Additionally, King must show that ACCELL received objective notice of his intent to engage in protected activity. *See Kaufman & Payton, P.C. v. Nikkila,* 503 N.W.2d 728, 732 (Mich. Ct. App. 1993) ("[A]n employer is entitled to objective notice of a report or threat to report by the whistleblower.").

---

[1] It is undisputed that ACCELL terminated King's employment.

The parties devote much of their time disputing whether King engaged in a protected activity under the WPA. "The WPA contemplates three types of protected activity: '(1) reporting to a public body a violation of a law, regulation, or rule; (2) being about to report such a violation to a public body; or (3) being asked by a public body to participate in an investigation.'" *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 629 (6th Cir. 2013) (quoting *Chandler*, 572 N.W.2d at 212). These protections also extend to "employees who report a violation of the law 'or a suspected violation of a law or regulation or rule.'" *Henderson v. City of Flint, Michigan*, 751 F. App'x 618, 625 (6th Cir. 2018) (quoting M.C.L. 15.362). A suspected violation of the law is judged on a subjectively reasonable standard: the employee must have been acting in good faith and been subjectively reasonable in the belief that the conduct was a violation of the law. *Melchi v. Burns Int'l Security Services, Inc.,* 597 F. Supp. 575 (E.D. Mich. 1984). Specifically, the parties dispute whether King sufficiently reported a suspected violation of the law or if his report merely contained suspected future violations not covered under the WPA. The parties also dispute if King had a subjectively reasonable belief that ACCELL engaged in illegal conduct by failing to report or otherwise respond to students bringing weapons to the school in the past, thus prompting him to take the

gun he found directly to the police station rather than notifying administration.

However, even if the Court were to find that King engaged in protected activity, it would still grant ACCELL's motion for summary judgment and dismiss King's WPA claim because he has failed to establish a genuine issue of material fact as to the causal connection element. To show causation, a plaintiff must show that "[his] participation in the protected activity led to the adverse employment action." *Truman v. Jackson, City of*, 2016 WL 5661576, at *10 (E.D. Mich. Sept. 30, 2016) (quoting *Robinson v. Radian, Inc.*, 624 F. Supp. 2d 617, 635 (E.D. Mich. 2008) (internal citations omitted). A plaintiff must show "something more than a temporal connection between protected conduct and an adverse employment action." *Cooney v. Bob Evans Farms, Inc.*, 645 F. Supp. 2d 620, 631 (E.D. Mich. 2009), *aff'd*, 395 F. App'x. 176 (6th Cir. 2010). Furthermore, to satisfy the third prong of "causation," the employer must receive some form of objective notice of the report or the whistleblower's intent to report before the retaliatory activity occurs. *Smith,* 296 F. Supp. 2d at 762 (citing *Kaufman* 503 N.W.2d at 732–33); *see also Roberson v. Occupational Health Ctr. of Am., Inc.,* 559 N.W.2d 86, 88 (Mich. Ct. App. 1996) (citation omitted) (affirming that the defendant was entitled to

summary disposition when the plaintiff failed to establish that the defendant received any "objective notice of a report or a threat to report by the whistleblower.").

ACCELL argues that King cannot establish a causal connection between his termination and his protected activity because King has not produced evidence that Farris or Arnold saw the police report containing King's suspicions or were aware of the information contained therein prior to terminating his employment. ECF No. 39, PageID.667-68. The Court agrees. King claims that "Farris and Arnold found out" that he reported the administration for failing to act on weapon-related situations in the past but fails to cite to anything in the record to support his assertion that they knew or had constructive knowledge about the suspicions he reported. ECF No. 38, PageID.622. His claim that he "discussed these violations with management, possessed documentary evidence substantiating those discussions, and expressly threatened to report the employer" is also unsubstantiated by the record. *Id.* at PageID.616.

Indeed, "[a] plaintiff must establish a prima facie case of WPA to survive summary judgment." *Deneau v. Manor Care, Inc.*, 219 F. Supp. 2d 855, 860 (E.D. Mich. 2002) (citing *Kaufman* 503 N.W.2d at 732). To do so requires "show[ing] that defendants received objective notice of [his] intent

to engage in protected activity." *Id*. Here, the record only establishes that King informed Arnold and Farris that he found a gun in the school and brought it to the police station. ECF No. 35-9, PageID.497. Nothing shows that King told Arnold or Farris that he reported the administration for any suspected wrongdoing relating to past weapon-related incidents, or that they saw the police report where he relayed those suspicions prior to terminating his employment.

Furthermore, no evidence allows the Court to infer that Farris or Arnold would be on notice of the reason why King failed to notify them when he found the gun. To the contrary, King texted Farris and Arnold the day of the incident apologizing for not letting them know about finding the gun and for putting them in that situation. ECF No. 35-6, PageID.458. Based on their communications with King after the incident, a reasonable juror could not find that Farris and Arnold were aware that King's failure to notify them was based on his belief that they improperly handled these types of situations. Indeed, the Court finds nothing in the record suggesting that King told the administration that he believed it handled weapon-related incidents in a potentially illegal manner, or that he threatened to report them for this concern in the past.

There is also no evidence demonstrating that Arnold, Farris, or ACCELL administration possessed constructive knowledge of King's reported suspicions from the responding officers or other employees. For example, the Court cannot reasonably infer that other employees would have known about the substance of King's report and relayed that information to administration when King denied talking with other school employees during his suspension. ECF No. 35-9, PageID.500. King also denied speaking with the school's board of education members about the incident at any time. *Id.* at PageID.501. Moreover, Monroe denied speaking to other Barber Prep employees to find out if the school hid weapons and testified that it was not his place to do so. ECF No. 35-10, PageID.557. And King's argument[2] that the administration's knowledge came from a discussion between Monroe and Farris is undercut by Monroe's testimony.

> Q: Did you ever ask Miss Farris if they did training where they instructed their staff that if a weapon was discovered to take it in to the police immediately?
>
> A: Yeah, I believe I did.
>
>     ***

---

[2] During oral argument, the Court asked King what evidence supports his contention that the administration knew he reported the administration for suspected illegality. King directed the Court to Monroe's deposition testimony recounting his conversation with Farris.

> A: So I don't see where I put it in the report. I thought I had, but I do remember asking her about a training that had recently taken place and was that the protocol. I thought I put it in the report, but I guess I didn't. But I do remember talking to Miss Farris—I believe it was Miss Farris—and asking did the training articulate if a weapon was found to take it out of the building and bring it to police and she stated no.

ECF No. 35-10, PageID.555. Monroe's inquiry appears to have been motivated by confusion about King's actions—specifically, why King removed the gun from the school, contrary to what he believed to be standard protocol. King told Monroe he brought the gun to the police station pursuant to recent training, which Monroe found to be atypical when in "instances like this the school would notify [the police] so we would come in and remove it." *Id.* But a conversation about training protocols does not equate to a report about unlawful conduct. Therefore, even if Monroe asked Farris about the incident, this questioning does not demonstrate that she had objective notice that King engaged in the protected activity at issue here—reporting ACCELL for unlawfully failing to report weapon-related incidents. As such, the Court fails to see how Monroe's testimony shows that ACCELL had objective notice that King engaged in any protected activity.

After reviewing the evidence in a light most favorable to King, the Court finds that he failed to produced evidence creating a genuine issue of material fact with respect to whether ACCELL had "objective notice" that he reported it for suspected illegality in handling gun-related incidents. At most, the evidence shows that ACCELL knew that King went to the Highland Park Police to report that he found a gun on the school's premises—an activity devoid of any suspected illegal conduct attributable to ACCELL or its administration and thus, not "protected activity" under the WPA. Accordingly, King has not established a causal connection between his protected activity and his termination and therefore has failed to provide evidence demonstrating a prima facie case under the WPA.

### b. Termination in Violation of Public Policy Claim

King also claims that ACCELL terminated his employment for reasons that were contrary to public policy. ECF No. 6, PageID.40. Under Michigan law, an at-will employee may be discharged at any time for any or no reason. *Suchodolski v. Michigan Consol. Gas Co.*, 316 N.W.2d 710, 711 (Mich. 1982). However, Michigan courts have recognized an exception "to that rule, based on the principle that some grounds are so contrary to public policy as to be actionable." *Id.* As such, to come within the contours of a public policy claim under Michigan law, King must establish one of the

following exceptions to at-will employment: (1) he was discharged in violation of an explicit legislative statement prohibiting discharge of employees who act in accordance with a statutory right or duty; (2) he was discharged for refusing to violate the law; or (3) he was discharged for exercising a well-established statutory right. *Id.* at 711–12. Much like a claim raised under the WPA, a plaintiff claiming retaliatory discharge in violation of public policy must show: (1) that he engaged in protected activity; (2) knowledge of the activity by the employer; (3) adverse action against the employee; and (4) a causal link between the employee's conduct and the adverse employment action. *Landin v. Healthsource Saginaw, Inc.*, 854 N.W.2d 152, 163–64 (Mich. Ct. App. 2014).

Relying on the second *Suchodolski* exception, King alleges that he was terminated for engaging in protected activity by refusing to violate the law and refusing to conceal violations of the law. ECF No. 38, PageID.625. Specifically, King argues that ACCELL violated Michigan public policy by terminating him for reporting the administration's failure to report weapons in the school to the police, which he did out of concern for the "safety and welfare of the students" pursuant to M.C.L. 380.11a. ECF No. 38, PageID.625. Section 380.11a(3)(b) grants school districts with the power to enact policies "[p]roviding for the safety and welfare of pupils while at

school . . ." He contends that his "complaints about the safety and welfare of students" amounts to protected activity because he "refuse[d] outright directives to violate Michigan statutes" and "refused to conceal the violations by bringing those violations to the Highland Police Department." ECF No. 38, PageID.625.

The Court first turns to King's refusal to conceal claim. Refusal to conceal a violation of the law constitutes a protected activity if the plaintiff demonstrates that the defendant: (1) instructed the plaintiff not to disclose illegal conduct; and (2) conditioned the plaintiff's employment on an agreement not to disclose the conduct. *Rivera v. SVRC Indus.*, 980 N.W.2d 777, 782 (Mich. Ct. App. 2021) (holding that Michigan's "public policy that persons may not enter into agreements to conceal a crime or stifle a criminal investigation" is violated "when an employer conditions an employee's continued employment on the employee's agreement to conceal or stifle an investigation into criminal conduct.").

Here, nothing in the record suggests that ACCEL asked King to conceal any conduct—let alone illegal conduct relating to the student's safety and welfare. Nor is there evidence that ACCELL instructed King not to report his concerns to the police, or "conditioned [his] continued

employment on [him] not reporting [the] conduct." See *Rivera*, 980 N.W.2d at 780. Thus, Michigan's public policy does not protect this activity.

Turning to King's argument that he engaged in protected activity by reporting the administration's failure to report weapons at school, he contends this was a refusal to violate the law and comply with the administration's policy that purportedly contravened with M.C.L. 380.11a(3)(b). ECF No. 38, PageID.624-25. Indeed, an employee's "failure or refusal to violate the law in the course of employment" is protected activity for the wrongful discharge tort at issue here. *Suchodolski,* 316 N.W.2d at 711. And unlike a refusal to conceal claim, King's refusal to violate the law claim does not require the employer's direction to violate a law, only the plaintiff's refusal to do so. *Morrison v. B. Braun Med. Inc.*, 663 F.3d 251, 256–57 (6th Cir. 2011).

Even if King could establish that he engaged in protected activity with his alleged refusal, his claim would still fail because King has presented no evidence showing that the administration knew that he refused to abide by the school's alleged non-reporting policy or that his report was a demonstration of his refusal. As previously stated, after establishing a protected activity, King must still prove three elements to establish a prima facie case: (1) that defendant knew of the protected activity; (2) that

Page **24** of **27**

defendant took adverse employment action, and (3) that there was a causal connection between the protected activity and the adverse employment activity. *Landin,* 854 N.W.2d at 163–64. Just as with his WPA claim, King cannot prove retaliation in violation of public policy unless he demonstrates that the defendant knew of the protected activity. *Simpson v. Total Renal Care, Inc.*, 629 F. Supp. 3d 680, 689 (E.D. Mich. 2022) (citing *Garg v. Macomb Cnty. Comm. Mental Health Srvs.*, 696 N.W.2d 646, 654 (Mich. 2005)). There is no evidence in the record that would allow the Court to infer that ACCELL knew of King's refusal.

Accordingly, King has not established that his refusal to conceal constitutes protected activity or that ACCELL was aware he was refusing to violate the law by reporting the administration's actions. As a result, King has failed to present evidence demonstrating a prima facie case of termination in violation of public policy.

### c. ELCRA Retaliation Claim

Lastly, King claims that ACCELL violated ELCRA when it terminated him for engaging in protected activities such as filing a complaint, assisting with, and/or participating in an investigation, proceeding, or hearing relating to ACCELL. ECF No. 6, PageID.41, ¶ 43. ACCELL argued it is entitled to summary judgment on King's ELCRA claim based on King failing to

establish that he engaged in a protected activity and for his failure to establish a causal connection between any protected activity and his termination. ECF No. 35, PageID.229-31. However, King failed to respond to ACCELL's motion for summary judgment as to his ELCRA claim. A plaintiff's failure to address a claim in response to a motion for summary judgment on that claim "demonstrates abandonment and waiver of the claim." *Crampton v. Kroger Co.*, 213 F. Supp. 3d 910, 913 (E.D. Mich. 2016). *See also Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013) ("[A] plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment."); *Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 525 (6th Cir. 2006) (holding that where the appellant failed to respond to two claims, the appellant abandoned those claims). The Court thus finds that King waived this claim and the Court grants ACCELL's motion for summary judgment on King's ELCRA claim.

## V. Conclusion

For the above reasons, the Court **GRANTS** ACCELL's motion for summary judgment on King's claims (ECF No. 35) and **DISMISSES** his complaint in its entirety. The Court **TERMINATES** ACCELL's motion to strike (ECF No. 40) as moot.

**IT IS SO ORDERED**.

s/ Shalina D. Kumar
SHALINA D. KUMAR
Dated: September 25, 2025          United States District Judge